UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 4/20/2017

GERALDINA GOMEZ

                                        Plaintiff,          16-CV-4251 (WHP)(SN)

            -against-                                       REPORT AND
                                                            RECOMMENDATION
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

-----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE WILLIAM H. PAULEY, III:

Geraldina Gomez seeks judicial review, under 42 U.S.C. § 405(g), of the Commissioner of Social Security's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] The Commissioner of Social Security moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

Gomez filed for DIB benefits on December 26, 2012, alleging that she was disabled as of January 24, 2012, due to bipolar disorder, depression, diabetes, and high blood pressure. Administrative Law Judge ("ALJ") Miriam L. Shore conducted a hearing on May 1, 2014, at which Gomez appeared represented by counsel. On September 26, 2014, the ALJ denied Gomez's claim for benefits, finding that although she did have severe impairments, she

---

[1] On January 18, 2017, the Social Security Administration promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 60 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. pt. 404 & 416). These new regulations apply only to claims filed with the Social Security Administration on or after March 27, 2017. Accordingly, because Gomez's claims were filed before this date, to the extent that Social Security regulations are cited in this Report and Recommendation, the Court is referring to the version of the regulations effective before March 27, 2017.

maintained a residual functional capacity to perform light work, except that she was limited to occasional squatting, kneeling, crouching, and crawling and occasional contact with coworkers, supervisors, and the general public, could only occasionally tolerate changes in the workplace, and could only perform a simple, repetitive job. Relying on the testimony of a vocational expert, the ALJ found that Gomez could not perform her past relevant work; however, because jobs existed in significant numbers in the national economy that Gomez could perform, the ALJ found that she was not disabled. On April 13, 2016, the Social Security Appeals Council denied review of the ALJ's decision, thus rendering it the final decision of the Commissioner.

For the reasons set forth below, the Court recommends that the Commissioner's motion for judgement on the pleadings be GRANTED.

## BACKGROUND

## I. Evidence in the Administrative Record

### A. Plaintiff's Statements to the Social Security Administration

In her initial application documents, Gomez alleged that she was disabled due to bipolar disorder, depression, diabetes, and high blood pressure. (Tr. 164.) On January 19, 2013, Gomez submitted a function report to the SSA. (Tr. 173–81.) She described her daily activities as waking up, brushing her teeth, getting dressed, attending rehab, and eating meals. (Tr. 174.) She stated that she could get dressed, shower, feed herself, and use the restroom. (Tr. 174–75.) She noted that she does not prepare meals because she had no access to a cooking facility, but prepared simple meals when she did have such access previously. (Tr. 175.) She noted that she does laundry and light cleaning in the corner of the room to which she is assigned without assistance. (Tr. 176.) She stated that she went outside daily, and could walk or use public transportation alone. (Tr. 176.)

Gomez noted that she went shopping twice a day, but clarified that she primarily meant going to convenience stores to purchase prepared meals. (Tr. 177.) She noted that her hobbies were watching TV, using the internet, and listening to music. (Tr. 177.) She stated she did not go out on a regular basis, but did chat with friends and her mother over the phone and through the computer. (Tr. 178.) She did note a decrease in her social activity since the onset of her alleged disability. (Tr. 178.)

When asked to characterize her exertional limitations, Gomez stated that she was limited to lifting five pounds, could not stand as long as she used to, could only walk three to four blocks, had problems sitting due to lower back pain, could only climb approximately one flight of stairs, and could not kneel or squat. (Tr. 178–79.) She noted some limitations with reaching and using her hands, and had no limitations in seeing, hearing, or talking. (Tr. 179.) She noted that in the past she had used a cane for thrombosis and a brace due to carpal tunnel syndrome. (Tr. 179.)

Gomez noted that she had problems paying attention and finishing what she started because she became easily distracted by her life's problems. (Tr. 180.) She especially identified problems with memory and stated that she had a short attention span and would forget appointments. (Tr. 181.) She did not, however, identify problems following written or oral directions and denied having had problems with authority figures. (Tr. 180.)

## B.    Medical Evidence

The record consists of consultative examination reports from Dr. David Mahony, a psychologist, and Dr. John Fkiaras, a family medicine practitioner, treatment notes from the Help/PSI Service Corp. primary care clinic, and medical source statements from Rhealynne

Quindor, FNP-BC, Patricia McCabe, NPP, Michelle Roldan, MSW, and Dr. Karamchand Rameshwar.

### 1. Records from Treating Physicians and Medical Staff

#### i. Physical Records

On September 26, 2012, Gomez saw FNP-BC Rhealynne Quindor at the HELP/PSI clinic for an initial physical examination. (Tr. 334.) Quindor assessed her as a 4 on the PHQ-9 depression scale, suggesting minimal depression. (Tr. 334.) Gomez reported a history of type 2 diabetes, treated with Metformin and diet. (Tr. 334.) Gomez reported generalized muscle and joint pain, but her musculoskeletal and neurological exams were normal. (Tr. 335–36.) Quindor referred Gomez to psychiatry for an evaluation concerning depression with anxiety and to nutrition to manage her health and diabetes. (Tr. 339.)

On October 2, 2012, Gomez saw NP Roberta Kelly to review blood tests. (Tr. 236.) Kelly noted that Gomez had poor adherence to her diabetes medication and counseled her regarding the importance of improving compliance with the treatment regimen. (Tr. 237.) Gomez generally reported being in a good state of health, and physical examination was unremarkable except for an obstruction in Gomez's right ear canal. (Tr. 239.) An evaluation with FNP Quindor on October 4, 2012, was largely identical, and focused on the foreign body in Gomez's ear. (Tr. 234–35.)

Gomez saw NP Quindor on November 2, 2012, for ear pain and a left knee cyst. (Tr. 202–03.) Physical examination was normal except for discomfort and muffled hearing in the right ear and a fluid-filled sac below Gomez's left knee. (Tr. 203.) Regarding the knee condition, Gomez stated that "at first it used to hurt, but it doesn't bother me now," and Quindor noted that it had been present for approximately ten years. (Tr. 203.) Quidnor referred Gomez to

orthopedics because of the mild discomfort in her knee and told her to visit an otolaryngologist for her ear problem. (Tr. 203.)

Gomez next saw NP Quindor on December 28, 2012, for complaints of a dry cough and right arm and neck pain of short duration. (Tr. 220.) On physical examination, she had mild erythema of the throat, discomfort on full range of motion of the right shoulder, and mild tenderness on palpation of the shoulder and neck. (Tr. 220.) Quindor prescribed ibuprofen and Flexeril for the muscle pain. (Tr. 221.)

On May 9, 2013, NP Quindor completed a statement of Gomez's physical ability to perform work-related activities. (Tr. 319–24.) Quindor found that Gomez could never lift any amount of weight, occasionally carry up to ten pounds but never more than ten pounds, occasionally use her hands for reaching, handling, fingering, feeling, pushing and pulling, and frequently operate foot controls. (Tr. 319–20.) She opined that Gomez could sit for 30 minutes and stand or walk for 10 minutes at one time without interruption, and during an eight-hour work day she could sit for four hours and stand or walk for 30 minutes. (Tr. 321.) Quindor stated that Gomez did not require the use of a cane to walk. (Tr. 321.) Quindor stated that Gomez could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl, and occasionally climb stairs and ramps or balance. (Tr. 322.) Gomez could never be exposed to unprotected heights, moving mechanical parts, pulmonary irritants, and extreme heat, occasionally be exposed to humidity, wetness, extreme heat, and vibrations, and frequently operate a motor vehicle. (Tr. 323.) Quindor stated that Gomez could not perform activities like shopping or climb a few steps at a reasonable pace with the use of a single hand rail, but could travel alone, walk without assistance, use public transportation, prepare simple meals, care for her personal hygiene and sort and handle files. (Tr. 324.)

On March 27, 2014, an x-ray was taken of Gomez's left knee. It showed "degenerative changes with spurring of the femoral condyles, tibial plateaus, tibial eminences and patella" and "calcification along the medial epicondyle that may be due to calcific tendinitis." (Tr. 368.)

NP Quindor completed another assessment on April 16, 2014. (Tr. 361–67.) In this assessment, she noted that Gomez had been suffering from left knee pain intermittently since 2008, and diagnosed her with arthropathy characterized by pain exacerbated by walking or standing for long periods of time. (Tr. 361.) Quindor noted that Gomez's physical pain often interfered with her attention and concentration, and that Gomez had moderate limitations in dealing with work stress. (Tr. 362.) She noted that Gomez could sit for only 15 minutes before alternating postures such as standing or walking around, and could cumulatively sit for less than one hour in an eight-hour work day. (Tr. 362–63.) Quindor noted identical restrictions for standing and walking about. (Tr. 363–64.)

In regards to Gomez's exertional capacities, Quindor noted that she could occasionally lift and carry one to five pounds, but could never carry six pounds or more. (Tr. 365.) Gomez was found to be able to balance, reach and work with her fingers occasionally, but never stoop. (Tr. 365–66.) Gomez did not use an assistive device for walking. (Tr. 366.) Quindor estimated that Gomez would likely be absent from work about twice a month due to her impairments. (Tr. 367.)

### ii.    Psychiatric Records

On October 5, 2012, Gomez saw NPP Patricia McCabe for an initial psychiatric assessment. (Tr. 229–33.) Gomez noted that she felt anxiety when on crowded trains or in job interviews, and often felt worried, nervous, jittery, short of breath, or afraid of losing control. (Tr. 229.) McCabe note that Gomez reported a depressed mood since last year and reported

feeling sad and afraid of feeling hopeless, with crying, low motivation, anhedonia, difficulty concentrating, low energy level and social isolation. (Tr. 230.) Gomez denied any history of suicidal or homicidal ideation or current psychosis. (Tr. 230.) She also discussed various psychosocial stressors related to loss of employment and housing, and various traumatic events occurring in the past. (Tr. 230.)

On examination, McCabe found that Gomez was appropriately dressed and groomed, had a cooperative attitude, normal speech, appropriate form and content of thoughts, and alert cognitive functioning. (Tr. 231.) She presented as depressed and anxious in her mood but appropriate in affect, and had fair concentration, insight, and judgment, and good impulse control and intellectual functioning. (Tr. 231–32.) McCabe assessed Gomez as having major depression, single episode, drug dependence in remission, and rule out bipolar disorder, and gave her a Global Assessment of Functioning ("GAF") score of 60. (Tr. 232.) McCabe noted that Gomez was capable of independent living, managing finances, travelling independently, and taking medications. McCabe prescribed psychotherapy and medication. (Tr. 232.)

On November 13, 2012, Gomez had a follow-up appointment with NPP McCabe. (Tr. 213–14.) Gomez noted that she was doing better and participating in groups, beginning to go to the gym, and was feeling less anxious with fewer stressors. (Tr. 213.) Gomez's diagnosis was unchanged from major depression, single episode. (Tr. 213.) On the same day as her visit with NPP McCabe, Michelle Roldan, MSW prepared a psychosocial evaluation of Gomez. (Tr. 209–12.) Roldan's conclusions were largely consistent with NPP McCabe's.

On April 2, 2013, NPP McCabe and psychiatrist Dr. Karamchand Rameshwar completed a psychiatric disability report. (Tr. 315–16.) Gomez's diagnoses were bipolar disorder and recent episodes of depression, which were treated with lithium, and polysubstance dependence in

remission. (Tr. 315.) The report noted that Gomez's depression and manic symptoms were improved with the lithium treatment. (Tr. 315.) Gomez indicated that at times she had mood lability, but was otherwise alert, oriented, calm and cooperative, with good memory and fair insight and judgment. (Tr. 315.) The only functional limitations the treating practitioners noted was that Gomez reported that she can overextend herself and has difficulty "saying no" or setting limits. (Tr. 316.) NPP McCabe and Dr. Rameshwar reported Gomez's mental health estimate as "good," but noted that they were unable to assess her potential work ability. (Tr. 316.)

Two months later, Gomez saw NPP McCabe for an updated psychiatric evaluation. (Tr. 343–49.) Gomez reported recent anxiety and hypomanic symptoms such as racing thoughts and distraction. (Tr. 343.) She also reported increased energy and goal directed activity such as thinking about going back to school. (Tr. 343.) McCabe noted a generally normal mental status exam, except that Gomez had an anxious mood. McCabe noted that Gomez had fair insight, impulse control, and judgment. (Tr. 346.) McCabe diagnosed Gomez with "bipolar disorder, depressed," drug dependence in remission, and a GAF score of 60. (Tr. 346.) The report was cosigned by Dr. Karamchand Rameshwar. (Tr. 347.)

Two days later, NPP McCabe completed a medical source statement about Gomez's mental impairments. (Tr. 327–31.) After reviewing Gomez's diagnoses consistent with her prior treatment notes, McCabe was asked to identify functional limitations caused by her impairments. McCabe noted "extreme loss" in Gomez's ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms and her ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 329.) "Marked" losses were noted in her ability to remember locations and work-like procedures, understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for

extended periods, sustaining an ordinary routine without special supervision, and dealing with the stress of semi-skilled or skilled work. (Tr. 329.) "Moderate" losses were noted in her ability to understand, remember, and carry out simple instructions, make simple work-related decisions, and work in coordination or proximity with others without distraction, while no limitations were noted in her ability to maintain regular attendance and punctuality. (Tr. 329.)

Regarding Gomez's ability to work with others, McCabe assessed "marked" loss in her ability to accept instructions and respond appropriately to criticism from supervisors and get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 330.) She had "moderate" loss in her ability to interact appropriately with the public, ask simple questions or request assistance, maintain socially appropriate behavior, respond appropriately to changes in work settings, and set realistic goals or make plans independently of others. (Tr. 330.) She had no limitations with neatness or cleanliness, travel in unfamiliar places or public transportation, or normal hazards. (Tr. 330.) Overall, McCabe found no restrictions in activities of daily living, "moderate" difficulties in maintaining social functioning, "constant" deficiencies of concentration, persistence, or pace, and "continual" episodes of deterioration or decompensation in work like settings. (Tr. 330–31.) The source statement was co-signed by Dr. Karamchand Rameshwar. (Tr. 331.)

McCabe also filled out an identical questionnaire dated March 20, 2014. (Tr. 355–59.) Her conclusions were similar, except that she assessed "extreme" loss in additional areas, such as Gomez's abilities to understand, remember, and carry out detailed instruction, maintain attention and concentration for extended periods, work in coordination or proximity to others, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 357–58.)

### 2. Consulting Physicians

Psychologist Dr. David Mahony performed a psychiatric evaluation of Gomez on February 15, 2013. (Tr. 244–47.) He noted that Gomez saw NPP McCabe as her treatment provider and characterized the psychiatric treatment as "not helpful." (Tr. 244.) Gomez reported initial insomnia, loss of appetite, and symptoms of depression, including depressed mood and crying spells, as well as a history involving impulsive sexual behavior and mania. (Tr. 244.) She denied anxiety-related symptoms, thought disorders, or any other behavior problems or cognitive deficits. (Tr. 244–45.)

Upon examination, Dr. Mahony found that Gomez had normal gait, posture, motor behavior, eye contact, and speech. (Tr. 245.) Thought processes were coherent and goal oriented, with no evidence of hallucinations, delusions, or paranoia. (Tr. 245.) Her affect and mood ranged from euthymic to depressed, and she was oriented. (Tr. 245.) Dr. Mahony did note that Gomez's attention, concentration, and memory was impaired due to cognitive limitations; while she was able to count and do simple calculations, she refused to do serial 3s, and she recalled 3 out of 3 objects immediately, 2 out of 3 objects after five minutes, and could recall 4 digits forward and no digits backward. (Tr. 245–46.) While Dr. Mahony found that her insight and judgment were good, he found below average cognitive functioning and a limited general fund of information. (Tr. 246.) Otherwise, he found that Gomez was capable of performing all the basis activities of daily living. (Tr. 246.)

Dr. Mahony's conclusion was that Gomez could follow and understand simple directions and instructions and perform simple tasks independently. (Tr. 246.) She could maintain attention and concentration, keep a regular schedule, learn new tasks, perform complex tasks independently, and relate adequately to others. (Tr. 246.) She would have moderate difficulties

making appropriate decisions and dealing with stress due to psychiatric problems, which Dr. Mahony found "may interfere with the claimant's ability to function on a daily basis." (Tr. 246.) Dr. Mahony diagnosed Gomez with "bipolar II disorder" and recommended that she continue to receive psychiatric treatment and receive vocational training, but gave her a poor prognosis because she was not "motivated to return to work." (Tr. 247.)

On the same day, Gomez was given an internal medicine evaluation by family medicine practitioner Dr. John Fkiaras. (Tr. 249–52.) Gomez reported lower back pain ranging from 4/10 to 10/10 and bilateral knee pain ranging from 4/10 to 5/10 since 2000. (Tr. 249.) She stated that standing for more than an hour, lifting more than four pounds, walking more than one and a half blocks, or climbing more than one flight of stairs exacerbates her pain. (Tr. 249.) Gomez also complained of numbness of the left hand and bilateral numbness in the feet. (Tr. 249.) She claimed to not do any cooking or cleaning, do the laundry once a month, shower thrice weekly, and dress daily. (Tr. 250.)

On physical examination, Dr. Fkiaras found that Gomez had a normal gait and stance, and could walk on heels and toes without difficulty, but could only squat one third of the way down. (Tr. 250.) She required no assistive devices or help changing, and could rise from a chair without difficulty. (Tr. 250.) Her physical exam was largely normal, with the exception of crepitus in her left knee and flexion limitations to 140 degrees. (Tr. 251.) She was diagnosed with lower back pain, bilateral knee pain, diabetes, and hypertension, with a fair prognosis. (Tr. 252.) Dr. Fkiaras's final conclusion was that Gomez had a moderate-to-marked limitation in squatting, kneeling and crouching and a moderate limitation in lifting, carrying, pushing, and pulling, secondary to low back and bilateral knee pain. (Tr. 252.)

C.      The ALJ Hearing

At the May 1, 2014 hearing before ALJ Miriam L. Shore, Gomez appeared represented
by counsel. (Tr. 32.) Gomez testified that she had an associate's degree and past work as a
security guard, airport baggage checker, and a sales representative. (Tr. 35–36.) Her prior jobs
ended either in termination or layoffs. (Tr. 38–40.) Though Gomez denied using drugs after the
early 1990s, she reported checking into a drug rehabilitation program called Narco Freedom,
which assisted her with housing and case management, including providing her access to treating
psychiatric providers and medication. (Tr. 41.) She recounted doing a 90-day training program to
be a "peer counselor" for a drug treatment organization, but was never hired. (Tr. 49–51.)

Gomez stated that despite medication, she continued to suffer from symptoms associated
with depression, such as fatigue and inability to get up in the morning. (Tr. 45–46.) She
estimated that she would be unable to get out of the bed in the morning once to twice a week and
would often miss appointments. (Tr. 46.) She stated that she couldn't lift objects due to body
pain in her back, hip, and leg, and that she had tingling in her fingers and toes. (Tr. 47.) She
gauged her lifting capacity at two pounds. (Tr. 55.)  She stated, however, that she was not given
pain medication by her doctor because it might conflict with her diabetes condition. (Tr. 47.)
Functionally, Gomez reported that she had issues sitting comfortably for an extended period of
time, but had no limits as to standing and walking. (Tr. 55.)

Gomez described continued anxiety and racing thoughts, and reported some side effects
from medication such as claustrophobia and sensitivity to noise. (Tr. 52–53.) She reported
memory issues and panic attacks that affected her back, made her nerves feel jittered, and made
her want to "run out" of stressful situations. (Tr. 59.)

As to her daily activities, Gomez testified that she lived in a residential treatment facility with a roommate. (Tr. 42.) She stated that she does not cook because of lack of access to cooking facilities and is brought food by a friend. (Tr. 43.) She stated that her friend does her laundry, and she spent most of her day going to groups and listening to music. (Tr. 53–54.) After the ALJ questioned Gomez about a November 2012 statement to NPP McCabe that she was going to a gym, Gomez stated that that lasted a week at most due to soreness and pain. (Tr. 48.)

After hearing from Gomez, ALJ Shore solicited testimony from Ms. Carlen, a vocational expert. The vocational expert identified Gomez's past relevant work as telephone solicitor (sedentary semi-skilled), security guard (light semi-skilled), and baggage checker (medium semi-skilled). (Tr. 62–63.) The ALJ inquired about whether an individual with Gomez's age and educational background and ability to perform light work could perform her past work, if she had the following exertional and non-exertional limitations: can only occasionally squat, kneel, crouch, and crawl, can only do simple and repetitive tasks, have only occasional contact with coworkers, supervisors, and the general public, and only occasionally tolerate changes in the workplace. (Tr. 63–64.)

The vocational expert found that Gomez could not do her past relevant work. (Tr. 63–64.) She did find, however, that other work existed in the national economy that would be within the residual functional capacity identified by the ALJ, including assembler of small products (light unskilled), routing clerk (light unskilled), and mail clerk (light unskilled). (Tr. 64.)

## II.     The ALJ Decision

In a September 26, 2014 decision, ALJ Shore found that Gomez had not engaged in substantial gainful activity since the alleged onset date of her disability, and had four severe impairments as defined in 20 C.F.R. § 404.1520(c): bipolar disorder, degenerative joint disease

of the left knee, diabetes mellitus, and obesity. (Tr. 11.) The ALJ found that hypertension was a medically determinable impairment, but was well-controlled by medication and asymptomatic, and thus did not result in any appreciable limitations so as to be considered "severe." (Tr. 11–12.)

At step three of the sequential analysis, the ALJ found that the impairments did not meet or equal the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12.) The ALJ gave special consideration to Listing 1.02(A) (major dysfunction of a joint) and 12.04 (affective disorders). (Tr. 12.) As to Listing 1.02(A), despite the medical evidence of degenerative left knee disease, the ALJ found that the evidence did not show that Gomez was unable to ambulate effectively, defined in the listings as an "extreme limitation of the ability to walk" and "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device." (Tr. 12.) As to Listing 12.04, the ALJ considered and found that Gomez's impairments did not satisfy the "Paragraph B" or "Paragraph C" criteria of the listing. (Tr. 12–13.) The ALJ also considered Gomez's obesity in accordance with Social Security Ruling ("SSR") 02-1p, and found that it did not raise her impairments to the level of meeting or medically equaling a listing. (Tr. 14.)

Moving on to calculate Gomez's residual functional capacity ("RFC"), the ALJ found that Gomez could perform light work as defined in 20 C.F.R. § 404.1567(b), except that she was limited to occasional squatting, kneeling, crouching, and crawling, occasional contact with coworkers, supervisors, and the general public, could only occasionally tolerate changes in the workplace, and could only perform a simple, repetitive job. (Tr. 14.)

In reaching this conclusion, the ALJ found that while Gomez's impairments could reasonably cause the symptoms alleged by Gomez, her statements concerning the intensity,

persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 15.) Weighing Gomez's physical restrictions, the ALJ gave great weight to the consultative examination of Dr. Fkiaras, which was consistent with the results of March 2014 left knee x-rays. (Tr. 17.) Conversely, the ALJ accorded little weight to the opinions of FNP-BC Quindor, whose responses on questionnaires regarding Gomez's limitations she deemed to be inconsistent with her treatment notes. (Tr. 18.) Considering Gomez's mental or psychiatric restrictions, the ALJ gave some weight to Dr. Mahony's opinion that Gomez's difficulties detract from her ability to make appropriate decisions, but little weight to his conclusion that her impairments may interfere with her ability to function on a daily basis. (Tr. 17.) The ALJ gave some weight to MSW Roldan's psychosocial assessment identifying moderate limitations on Gomez's activities of daily living, but little or very little weight to opinions from Dr. Rameshwar and NPP McCabe, finding that they either reiterated Gomez's subjective allegations verbatim or were unsupported by the objective medical evidence, and inconsistent both internally and with other evidence on the record. (Tr. 18.) Finally, the ALJ considered Gomez's statements to doctors and at the hearing, which suggested that her functional limitations were not as severe as assessed. (Tr. 19.)

At step four of the sequential analysis, consistent with the vocational expert testimony, the ALJ found that Gomez was unable to perform her past relevant work. (Tr. 20.) At the final step, she found that jobs existed in significant numbers in the national economy that Gomez could perform. (Tr. 21.) Accordingly, the ALJ concluded that Gomez was not disabled. (Tr. 21–22.)

# ANALYSIS

## I.    Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and emphasis omitted).

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is a sufficient basis for granting the motion. See Wellington v. Astrue, 12-CV-3523 (KBF), 2013 WL 1944472, at *2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09-CV-1701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct.

20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Alvarez v. Barnhart, 03-CV-8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits).

## II.     Definition of Disability

A claimant is disabled under the Social Security Act if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 404.1520. The steps are followed

in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 [(the "Listings")] . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform his past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her residual functional capacity, age, education and past relevant work experience. 20 C.F.R. 404.1560(c)(2); Melville, 198 F.3d at 51.

## III. Analysis

### A. ALJ's "Step Three" Analysis is Supported by Substantial Evidence

Because the ALJ found for the claimant in steps one and two of the Social Security Administration's sequential five-step process, the Court reviews whether her decision that Gomez's severe impairments of bipolar disorder and degenerative disease of the left knee did not meet or medically equal the criteria of a listed impairment was supported by substantial evidence.

An affective disorder will qualify as equivalent to a "listed impairment" if there is medically documented persistence, either continuous or intermittent, of depressive syndrome resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[2] 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B) (so-called "paragraph B criteria"). If the mental disorder does not qualify as a listed impairment under these standards, it will still qualify as a disability if there is:

> a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended duration; or a [r]esidual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(C) (so-called "paragraph C criteria").

Considering the paragraph B criteria, the ALJ found that Gomez had moderate restrictions in daily living and social functioning, mild difficulties with regard to concentration, persistence, and pace, and no periods of decompensation of extended duration. (Tr. 13–14.) The ALJ further found that the paragraph C criteria were not met. (Tr. 14.)

---

[2] "The term repeated episodes of decompensation, each of extended duration in the[] listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." If the claimant has experienced "more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at § 12.00(C)(4).

Though treating source NPP McCabe assessed "extreme" and "marked" loss in different categories relating to Gomez's concentration, persistence, and pace and social functioning and "continual" episodes of decompensation (Tr. 327–31, 355–59), the ALJ found that these limitations were inconsistent with the underlying treating notes, with Dr. Mahony's assessment of significantly more limited restrictions, (Tr. 246), and with Gomez's self-reporting. (Tr. 13.) Given that the Court concludes in the following section that the ALJ properly applied the treating physician rule in according little weight to NPP McCabe's opinions (co-signed by Dr. Rameshwar), it finds that the ALJ's conclusion that Gomez did not meet or equal listing 12.04 to be supported by substantial evidence.

As for the ALJ's conclusions in regards to Listing 1.02(A), this listing requires "[i]nvolvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.02A. An inability to ambulate means "an extreme limitation of the ability to walk . . . [and] having insufficient lower extremity functioning [ ] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. at § 1.00B2b(1). Effective ambulation means being capable of "sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living [and having] the ability to travel without companion assistance to and from a place of employment or school." Id. at § 1.00B2b(2). Examples of ineffective ambulation include an "inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Id.

As the ALJ noted, there is no medical evidence in the record that Gomez uses an assistive device or cannot ambulate effectively. <u>See</u>, <u>e.g.</u>, Tr. 250 (Dr. Fkiaras noting normal gait and stance and lack of assistive device); Tr. 321 (NP Quindor's notes indicating that Gomez does not use a cane to ambulate). Accordingly, her finding that Gomez's impairments did not meet or medically equal Listing 1.02(A) was supported by substantial evidence.

**B.**   **ALJ's Calculation of Residual Functional Capacity and Weighing of Expert Opinions was Supported by Substantial Evidence**

The determination of residual functional capacity ("RFC") is an administrative assessment based on the totality of the evidence of the extent to which a claimant's impairments and related symptoms affect her capacity to perform work related activities. 20 C.F.R. § 404.1545. The ALJ must weigh all of the available evidence to make an RFC finding that is consistent with the record as a whole. <u>Matta v. Astrue</u>, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).

The Social Security regulations require the ALJ to give controlling weight to the opinions of "treating sources" when those opinions are well-supported by medical evidence and "not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of impairments "and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." <u>Id.</u> Even if the treating physician's opinion is contradicted by other substantial evidence, it should be entitled to "some extra weight" because "the treating source is inherently more familiar with a claimant's medical condition than are other sources." <u>Schisler v. Bowen</u>, 851 F.2d 43, 47 (2d Cir. 1988). But "the less consistent that

opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ discredits the opinion of a treating physician, she must follow a structured evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec'y, 994 F. Supp. 2d 496, 506 (S.D.N.Y 2014). The ALJ must consider: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of the treating physician's opinion with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (holding that "to override the opinion of a treating physician . . . the ALJ must explicitly consider" these factors); but see Halloran v. Barnhart, 362 F.3d 28, 32–33 (2d Cir. 2004) (affirming ALJ decision that did not explicitly reference factors but "applied the substance of the treating physician rule").

### 1. Physical Impairments

In regards to Gomez's physical impairments, the medical record consisted largely of Gomez's own statements to the SSA and the ALJ, treatment notes and source statements from nurse practitioner Quindor, the source statement from consultative examiner Dr. Fkiaras, and the results of Gomez's March 2014 knee x-ray. In calculating Gomez's RFC, the ALJ relied primarily on Dr. Fkiaras's examination findings and opinion and the x-ray imaging, and largely discounted NP Quindor's assessments of Gomez's functional capacity. (Tr. 17–18.)

As a preliminary matter, NP Quindor's opinions are not entitled to controlling weight under the treating physician rule because she is not an "acceptable medical source" as defined in Social Security Ruling ("SSR") 06-3p. "Acceptable medical sources" are licensed physicians,

psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). In contrast, nurse practitioners are "other sources" whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight. 20 C.F.R. § 404.1513(d). Therefore, while the ALJ is certainly free to consider the opinions of "other sources" in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician. See Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir.1983) ("[T]he diagnosis of a nurse practitioner should not be given the extra weight accorded a treating physician.").

At any rate, NP Quindor's assessments of serious functional restrictions, (Tr. 319–24; 361–67), including that Gomez could sit, stand, or walk for only one hour out of an eight-hour day, (Tr. 362–64), are wholly unsupported by her treatment notes. These notes show largely normal physical examinations, (Tr. 203, 220, 335–36), which included normal musculoskeletal and neurological function, during which Gomez reported limited pain, no joint swelling, no limitation in range of motion, and no muscle weakness. (Tr. 336.) The most abnormal musculoskeletal findings were discomfort on full range of motion of the right shoulder and mild tenderness on palpation of the shoulder and neck. (Tr. 220.) There is no indication in her notes or Gomez's testimony to the ALJ that she actually received any treatment for any musculoskeletal issue.

Moreover, NP Quindor's conclusions were flatly contradicted by Dr. Fkiaras's findings. Dr. Fkiaras had a host of normal findings, including normal gait and stance, ability to walk on heels and toes without difficulty, full range of motion of the lumbar spine, and negative straight leg test. (Tr. 250.) The only abnormal finding was crepitus in the left knee and mild flexion

limitations to 140 degrees. (Tr. 251.) Based largely on the knee pathology (later confirmed by the March 2014 x-ray imaging), Dr. Fkiaras found that Gomez had moderate to marked limitations in squatting, kneeling, and crouching, and moderate limitations in lifting, carrying, pushing, and pulling. (Tr. 252.)

Therefore, given the inconsistency of NP Quindor's questionnaire with the record and the consistency of Dr. Fkiaras's conclusions, the ALJ's decision to accord little weight to the former and great weight to the latter was supported by substantial evidence. In turn, the ALJ's calculated RFC, which limited Gomez to light work (requiring lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently), with only occasional squatting, kneeling, crouching, and crawling, was consistent with Dr. Fkiaras's examination and the x-ray imaging. (Tr. 252, 368.) Therefore, the ALJ's incorporation of Gomez's physical limitations into her RFC was supported by substantial evidence.

### 2. Mental Impairments

In regards to Gomez's mental impairments, the record largely consisted of NPP McCabe's treatment notes and source statements (some of which were cosigned or otherwise endorsed by psychologist Dr. Rameshwar), consultative examiner Dr. Mahony's examination findings and conclusions, and Gomez's own statements to the SSA and the ALJ. In calculating Gomez's RFC, the ALJ gave some weight to Dr. Mahony's opinion that Gomez had moderate difficulties dealing with stress and making appropriate decisions, but little weight to his opinion that the impairment would interfere with her ability to function on a daily basis. (Tr. 17.) The ALJ also gave little weight to two opinions from NPP McCabe, which she found to be unsupported by the treatment notes, inconsistent with one another and other opinions of record, and contradicted by Gomez's statements. (Tr. 18.)

As is the case for NP Quindor, NPP McCabe's opinions are not entitled to controlling weight under the treating physician rule because she is not an "acceptable medical source" as defined in Social Security Ruling ("SSR") 06-3p. In her case, however, many of the opinions were co-signed or endorsed by "contributing psychiatrist" Dr. Karamchand Rameshwar, though his role in the evaluation or treatment of Gomez is uncertain and there is no clear evidence in the record that he ever physically saw her. See Tr. 58–59 (Gomez referencing seeing NPP McCabe to ALJ, with no reference to Dr. Rameshwar); Tr. 244 (Gomez reporting to Dr. Mahony that she was seeing a "nurse practitioner" at HELP/PSI).

Regardless of whether the opinions are attributed to Dr. Rameshwar or NPP McCabe, they are plainly inconsistent with the treatment notes and unsupported by objective medical evidence. NPP McCabe's treatment notes do mention Gomez's self-reporting of depressive symptoms, anxiety, and hypomanic symptoms, and she was eventually diagnosed with bipolar disorder. (Tr. 213, 230, 315, 343.) At the same time, McCabe assessed that she had fair concentration, insight, and judgment, with good impulse control and intellectual functioning. (Tr. 231–32.) McCabe also cited improvement in Gomez's depression and manic symptoms with lithium treatment. (Tr. 315.) She consistently assigned Gomez a GAF score of 60, suggesting moderate, not extreme limitations in functioning. (Tr. 232, 327, 346.)

Only two days after a mostly normal mental status exam on May 28, 2013, where "racing thoughts" and anxiety were the primary abnormalities, (Tr. 343–49), NPP McCabe's medical source statement identified "marked" losses in, *inter alia*, understanding, remembering, and carrying out detailed instructions and sustaining an ordinary routine without special supervision, and "moderate" losses in understanding, remembering, and carrying out simple instructions and making simple work-related decisions. (Tr. 327–31.) Less than a year later, without any

intervening treatment notes, NPP McCabe assessed "extreme" loss in ability to understand, remember, and carry out detailed instructions. (Tr. 357–58.) No objective evidence was offered to justify these limitations, either on the face of the questionnaires, or in the treatment notes.

Dr. Mahony's opinion, on the contrary, was consistent with his examination and largely consistent with NPP McCabe's treatment notes and Gomez's statements. She was assessed to have mild to moderate cognitive impairments, with mood and affect that ranged from euthymic to depressed, with good insight and judgment but below average cognitive functioning. (Tr. 245–46.) Gomez also told Dr. Mahony that she could dress, bathe, cook, clean, shop, and do all household activities of daily living without restrictions. (Tr. 246.) This is largely consistent with NPP McCabe's conclusions in treatment notes. See, e.g., Tr. 231–32 (McCabe notes referencing fair concentration, insight and judgment, and good impulse control and intellectual functioning, as well as Gomez being capable of independent living, financial management, independent travel, and medication compliance); see also Tr. 209–12 (similar conclusions made by MSW Michelle Roldan).

In response to Dr. Mahony's opinion regarding Gomez's difficulties with dealing with stress, and limitations to following and understanding simple directions and instructions and performing simple tasks, (Tr. 246), the ALJ incorporated several limitations to Gomez's RFC. Gomez was limited to simple, repetitive jobs, with occasional contact with coworkers, supervisors, and the general public and was deemed to be able to tolerate changes in the workplace only occasionally. (Tr. 14.) This was a reasonable accommodation of the impairment identified in the portions of Dr. Mahony's opinion to which the ALJ found accorded "some weight."

The ALJ also accorded "little weight" to the portion of Dr. Mahony's opinion that Gomez's impairment would interfere Gomez's ability to function on a daily basis. (Tr. 17.) An ALJ may properly "credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported." See Viteritti v. Colvin, No 14-CV-6760 (DRH), 2016 WL 4385917, at *11 (E.D.N.Y. Aug. 17, 2016) (citing Pellam v. Astrue, 508 F. App'x 87, 89 (2d Cir. 2013) (summary order)).

In this case, the ALJ's decision not to rely on this portion of Dr. Mahony's opinion was supported by substantial evidence. The statement itself is vague and boilerplate, unqualified by degree such as "marked," "moderate," or "mild," and is arguably inconsistent with the conclusions immediately preceding it about Gomez's ability to understand and follow simple directions, perform simple tasks, maintain attention and concentration, and maintain a regular schedule, as well as perform all the basic household activities of daily living. (Tr. 246.) It is also inconsistent with the treatment notes in the record, as indicated above.

In sum, the ALJ's weighing of expert opinions and her incorporation of Gomez's mental impairments into her RFC was supported by substantial evidence.

### C.        The ALJ Properly Met Her Burden at Step 5 of the Sequential Evaluation

At Step 4 of the sequential evaluation, the ALJ found that Gomez could not perform her past relevant work. (Tr. 20.) Accordingly, she proceeded to Step 5 of the sequential evaluation process. At this step, the Commissioner must demonstrate that other work exists in significant numbers in the national economy that the claimant can do, given her RFC, age, education, and work experience. 20 C.F.R. § 404.1569a.

Taking into consideration that she had assessed that Gomez had nonexertional limitations that might potentially erode the occupational base for unskilled light work, the ALJ consulted a vocational expert. (Tr. 60–64.) Based on the vocational expert's identification of three representative occupational titles: assembler of small products (DOT Code 706.684-022), routing clerk (DOT Code 222.687-02), and mail clerk (DOT Code 209.687-026), the ALJ found that jobs existed in significant numbers in the national economy that Gomez would be capable of performing. (Tr. 21.) Therefore, she concluded that Gomez was "not disabled" under 20 C.F.R. § 404.1520(g).

The ALJ's colloquy with the expert properly incorporated the mental and physical restrictions of Gomez's RFC that the Court has found to be supported by substantial evidence. (Tr. 63–64.) Accordingly, the ALJ's reliance on the vocational expert's testimony is itself supported by substantial evidence. See Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 114 (2d Cir. 2010) (summary order) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.") The Commissioner has met her burden to demonstrate that other work exists in significant numbers in the national economy that Gomez would be capable of performing.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for judgment on the pleadings be GRANTED.

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      April 20, 2017
            New York, New York

\*          \*          \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley, III at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Pauley. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

cc:          Geraldina Gomez (*by Chambers*)
             100 Co-op City Blvd. #24H
             Bronx, NY 10475